Nuclear Regulatory Commission. We'll hear first from Mr. Basch. Thank you, Your Honors, and may it please the Court. This case presents a quintessential major question. What will happen to all of the nation's most dangerous nuclear waste? In the 1980s, Congress answered that question. The waste is to be stored deep underground, managed by the U.S. government at Yucca Mountain, Nevada. The NRC, however, has offered a different answer that will govern for at least the next several decades, if not indefinitely, if its power grab here succeeds. Specifically, the waste will be stored above ground, managed by a private party in Texas and New Mexico oil fields. The NRC's answer is unlawful for many reasons, and I'd like to focus most of my time on the statutory authority reason. But first, I'd like to make two brief points about jurisdiction. First, Texas plainly has standing here for many reasons, perhaps the most obvious being that the state will incur emergency response training costs if all of this waste is going to come into its borders. The NRC essentially admits as much at page 4-75 of its environmental impact statement. Second, there is no exhaustion problem here. Texas filed comments in the agency proceedings that is more than adequate to confer party grief status under the Hobbs Act. The NRC's own authorities that it cited in its dismissal papers recognize as much, such as the ACA international case. As to statutory authority, I think this is actually a straightforward case. Congress announced in the Nuclear Waste Policy Act that the issue of what to do with the nation's most dangerous nuclear waste is a major subject of public concern. In other words, a major question. 42 U.S.C. 10131A7. But the NRC does not have any authority on it to take the action it took here. The NRC lacks tactical authority altogether under West Virginia v. EPA. That should be the end of the matter. It has nothing even coming close to the clear congressional authorization that West Virginia requires. I take it the state of Texas is asking us to create a split with the D.C. Circuit? That's right, Your Honor. I think that the Bull Creek Court, the D.C. Circuit, didn't have the benefit of some later decided Supreme Court decisions, most notably West Virginia v. EPA. Of course, we also think Bull Creek was wrong on the day that it was decided. The D.C. Circuit recognized there's no text in the Atomic Energy Act that actually confers the authority to nuclear waste. It said there's no explicit text, but that it said that it was long-standing theory, citing a bunch of cases, including a Supreme Court case. Right. That Supreme Court case does not stand for that proposition, Your Honor. That Supreme Court case upheld a California statute against the preemption challenge. That California statute... You acknowledge it's got some pretty broad language. It says that the AEC, which I take it is the NRC's predecessor. I don't think there's any dispute about that. I'm just quoting from page 190 of Pacific Gas. The AEC was given exclusive jurisdiction to license the transfer, delivery, receipt, acquisition, possession, and use of nuclear materials upon these subjects. No role was left for the states. Does that language bother you in terms of... Can you reconcile your position with that language? We recognize the language is broad, Your Honor. Of course, in one sense, it is dicta. The court there upheld the California statute that purported to regulate when nuclear reactors could be built. It depends on whether the reactor would have storage for the waste. But setting that aside, that language just says, the relevant part, I think, that the NRC has jurisdiction over the storage of waste. We don't dispute that in its most general sense. The NRC can tell a nuclear reactor, here's how you're going to store your waste on site. But the Supreme Court's dicta there says nothing about storing waste off-site. Of course, if it did, it would render multiple provisions of the Nuclear Waste Policy Act nonsensical and lead to the point of absurdity. Nuclear Waste Policy Act, as we pointed out in our briefing, contains multiple provisions that really can't be reconciled in a common sense manner with the idea that the Nuclear Regulatory Commission has always had this unstated power to license facilities to store waste off-site. Have they granted other licenses for temporary storage of spent nuclear fuel? Other away from reactor licenses, Your Honor? So the first license that they issued for a private away from reactor storage facility, a new facility, was the facility they had issued in the Bull Creek case. That facility was never constructed. Before that, they had issued licenses to facilities to store waste that had previously been constructed and licensed for different purposes. We pointed this out in our reply brief. The Morris facility in Illinois is the most prominent example. So the NRC there licensed the Morris facility as their reprocessing facility. We don't dispute that that was a valid license as either a utilization or production facility. The Morris facility, once the reprocessing concept failed, the Morris facility was re-licensed as a storage facility. No one challenged the NRC's authority to do that. And of course, the NRC had to do something there because you had this waste sitting at the Morris facility that was no longer going to be reprocessed. Something had to be done. Well, so I'm just grappling, maybe I'm oversimplifying things, but I mean is the state's position that the NRC has the authority to license like a permanent repository for permanent storage, underground, all those that yuck a mountain, and it has authority over storage of spent nuclear fuel at a reactor site, but nothing in between? I mean, or, I mean, I'm just grappling with what do you do? I mean, do they have, do they just lack power to license a temporary storage facility? They do lack power to license one away from the reactor, Your Honor. And I don't think that there's anything discordant with the fact that they have authority to license, or they have authority to tell nuclear reactors what to do with their waste on site. That's how, that's how atomic energy regulation has worked from the very beginning. And we identified some cases in our reply brief. I don't dispute, I don't think the NRC is disputing the factual accuracy of those cases, which says that Congress never contemplated that waste would have to be stored away from the reactor. Congress always thought when it enacted the Atomic Energy Act and upwards until it had to enact the Nuclear Waste Policy Act, the waste would be stored on site temporarily and then would be reprocessed. So Congress had no reason to address this question in the Atomic Energy Act. And in the NWPA, they also alternatively said that spent nuclear fuel could be stored at federal sites. That's right, Your Honor. That's one of the many provisions in the Nuclear Waste Policy Act that would be rendered nonsensical, nearly to the point of absurdity, I think, if the authority had claimed, Your Honor. If you don't mind, I'd like to identify one or two of those provisions. The first is that Congress established in the Nuclear Waste Policy Act that in addition to Yucca Mountain, the federal government could establish its own above-ground storage center, a so-called monitored retrievable storage center. But Congress explicitly provided that such a center was not allowed until the repository was licensed. The reason for that was to prevent complacency. It didn't want the federal government and industry to start the permanent repository. But the NRC's license here blows a hole through that entire framework because it licenses a private party to do exactly what Congress said the federal government must not do, build a storage center before a repository is licensed. If I may, there's another provision of the Nuclear Waste Policy Act that I think equally demonstrates that the Nuclear Regulatory Commission does not have this authority, and that's the fact that the Nuclear Waste Policy Act gave states a veto power over waste facilities, including monitored retrievable storage centers, 42 U.S.C. 10166. Congressional veto, right? The states have veto power, and the Congress can override that veto. But only the Congress can override that veto. The NRC can't override it, and much less a private party. But under the Nuclear Regulatory Commission's order here and under its interpretation of the statutes, states have no power to veto private facilities. There's just no conceivable reason why Congress would have set up that paradoxical framework, allowing states to veto a federal facility, but giving them no power over a private one that performs materially the same functions and imposes materially the same hazards. I would submit that's essentially unheard of under the law, this idea that states can bar a federal actor from doing something that it cannot bar a private party from doing, even when the private party's doing the same exact thing that we all recognize the states can prevent the federal actor from doing. There are multiple other provisions in the Nuclear Waste Policy Act, Your Honors. We've briefed those provisions. But in brief, I would note that the Nuclear Waste Policy Act deals, as Your Honor recognized, with interim storage in multiple respects, particularly at 42 U.S.C. 10151. That provision has five subsections, all explicitly providing that storage at the site of a reactor is the congressionally sanctioned interim solution until a permanent reactor is installed. Congress was allowed to provide limited federal storage space as a safety valve, but Section 10155B provides that the federal government could only permit that storage if a reactor showed that it could not expand its storage on site. And none of that makes a lick of sense if the NRC has always had authority to license storage off site. The NRC also makes a big deal of the fact here that its regulations, its storage regulations existed before Congress enacted the Nuclear Waste Policy Act. I think that's actually fatal for the NRC here. Congress explicitly preserved certain NRC regulations for storage, but it was only for storage at the site of a reactor, 42 U.S.C. 10153. The NRC's position is that Congress recognized that the NRC had these storage regulations and that it implicitly sanctioned those storage regulations when it didn't override them in the Nuclear Waste Policy Act. But of course, the Nuclear Waste Policy Act only preserved different regulations only for storage at the site of a reactor. Finally, I recognize that I'm running out of time here, but I would direct your honors to Judge Wilson's opinion from about a week and a half ago in the FERC case. I think that FERC's argument there was very similar to the argument that my friends on the other side are making here, this implied authority argument. I think in the FERC case, the agency said it had implied authority to do one thing derived from its express authority to do another. That's essentially what the Nuclear Regulatory Commission is arguing here. Just one question briefly. You referred to the state veto authority, which then kicks into Congress. Do I understand correctly, the state of Texas, at least at one time, wanted these facilities? There is material in the record from then Governor Perry recognizing that the facility may be desirable. Of course, Governor Perry's statement doesn't bind Governor Abbott. Governor Perry didn't purport to be binding future state officials. And Governor Perry, I think that letter is really just talking about the fact that Texas nuclear reactors needed somewhere for their waste. Governor Perry was not sanctioning the idea that waste from all over the country is going to come into Texas. My co-petitioner has some additional reasons to present why the NRC lacks authority to do what it did here. Thank you. Mr. Kanner. Good morning, Your Honors. May it please the Court. Alan Kanner for Petitioner's Fasken Land and Minerals and the Permian Basin Land and Royalty Owners. I have two main points. First, the NRC not only lacks authority to issue the ISP license here, but it is illegal. It's illegal for DOE to take title to HLR, high-level radioactive waste, or spent nuclear fuel before a permanent repository is created. My second main point, and we agree with Texas on the major question doctrine, my second main point is that the license should be vacated because of the illegality, and any administrative process, we would have to go through it again because of the confusion that was created by this license. Your Honor just asked a question about Governor Perry in 2014-2015. The original 2016 proposal only had DOE governmental waste included. It got changed in 2018 to be two different ways. And as you know, under the law, people are entitled to a fairly clear explanation as to what's going on. Let me go back to illegality for a second. So you've got DOE is prohibited from taking title, that would be section 1022A, and it's prohibited from contracting with private entities for interim storage. And that would be section 10156A. We also refer to the Congressional Research Service as making a similar finding, but that specific proposal, what we're dealing with here, was made and rejected. So under the APA and under the Hobbs Act, we're precluded, the government is precluded from acting illegally. Nothing in the AEA trumps the framework of the National Waste, of the Nuclear Waste Policy Act. So the AEA doesn't create special authority. And talk a little bit about this. We mentioned three different things in our discussion. We talked about the site selection. This is the Permian Basin we're talking about. The nation's energy security depends on the production of the Permian Basin. Let me ask you, we're familiar, at least two of us are intimately familiar with this, but would this storage be underground or above ground? Just sketch to me what this storage facility would look like when you're talking about thousands of metric tons. It's basically a bunch of metal casts on top of a parking lot with, unlike a DOE facility, no reprocessing or repackaging. So it looks like a fuel storage facility, right? Yes. Except the casts are smaller than your typical fuel tanks are. But yes, it's an above ground facility, which is one reason we think it would make an attractive target for terrorism, for example, something that was not considered by the government in all of this. You know, I want to emphasize in terms of site selection, besides it being the Permian Basin, we talk a lot about the rail structure. Right now you have to get in from the Union Pacific and then up the Texas-New Mexico rail line. In many places it's a single rail line. It's very vulnerable, not just to a, I mean, obviously a radioactive spill would be disastrous, especially where local government and the state of Texas are dealing with emergency response. But even just running out of time, I want to do, I do want to address the standing issue briefly because you haven't, I don't think you've talked about it here. Would it be fair to say that if we were to find that Texas has standing that we don't need to deal with your standing? In other words, are you asking for anything that Texas is not asking for? I think that we go a little bit broader than Texas. We participated in the proceedings for a number of years and have been strongly against it. We've built a record on it. They're talking mostly about the major question doctrine. We want a finding that having the DOE, having the ISP have authority to accept DOE waste is illegal. Is there any difference in the bottom line relief that you're asking for? I think if the, if you, if Texas wins on the, if we win on the major question doctrine, then certainly this all goes away. You don't even have to get to illegality and you certainly don't have to get over, get to the issue. I understand there's different reasons and arguments and whatnot, but the bottom line, there's no relief that I'm aware of that you're asking for. That Texas is not also asking for, or am I wrong? Yeah, we agree with Texas on vacating. The one thing I did want to say about standing, Your Honor, just to answer your question, is that the supplemental affidavits, we were given standing based on proximity in the administrative proceeding. We've really tried to lay out the economic interest. I mean, I believe the Tommy Taylor affidavit, declaration is, is very fundamental in talking about what happens to rail traffic, delays, infrastructure being ruined for transportation. Just my final comment, if I might, is that FASCN, the FASCN petitioners are not against, you know, the storage of nuclear waste. This is just the wrong location. The international agency- Okay. Thank you very much, Your Honor. Not in my backyard. Mr. Aberbach. Good morning, Your Honors. May it please the Court, my name is Andrew Aberbach from the United States Nuclear Regulatory Commission. I represent both the NRC as well as the United States. The issue of nuclear waste is a real problem for all these petitions for review. But even if the Court were to reach the merits, the petitioners here have ignored several key distinctions, distinctions between the Nuclear Regulatory Commission and the Department of Energy, between the Atomic Energy Act and the Nuclear Waste Policy Act, between the storage and the disposal of spent nuclear fuel, and between materials and facilities licenses. Fundamentally, Your Honors, petitioners fail to grasp that the license here reflects a Simply stated, the agency has acted within its lane and stayed within its lane. I can't address all the issues that have been raised today, but I'd like to focus quickly on jurisdiction, as the Counsel for Texas did, and then to address the major questions and AEA issues in particular. That will also lead to some discussion of some NWPA issues. Let me begin with jurisdiction. The simple fact is that all of the arguments that Texas and FASCN raised could have been raised as contentions through the NRC's adjudicatory process. Yet, we're sitting here today reviewing a freestanding challenge to the license itself, rather than any contentions that were raised before the NRC. Under these circumstances, neither Texas nor FASCN is a party aggrieved within the meaning of the Hobbs Act. Now, one thing Texas says in its brief is that the exhaustion requirement is discretionary and the court need not follow it. That's not true. That's not what this court said in Wales Transportation, where it specifically said that to be a party aggrieved, you must have participated in the proceedings before the agency. That's not the case here. Texas did not participate. Your theory is that you have to be a party to the NRC's proceeding? Because as you know, there are a lot of cases, or I assume you know, there are a lot of cases that talk about merely filing a comment being enough. That's true, Your Honor. Those cases— Is there any dispute Texas has done that? There's no dispute that Texas has, as has FASCN, filed comments vis-à-vis the draft Environmental Impact Statement. But, and I'm citing here to the ACA international case, the courts have made clear that where intervention is a prerequisite to participation, a person seeking subsequently judicial review must have tried to intervene before the agency. And that's set forth by agency regulation at 10 CFR 3.309A, which specifically states that any person whose interest may be affected by a proceeding and who desires to participate as a party must file a written request for hearing and a specification of the contentions which the person seeks to have litigated in the hearing. Texas didn't do that here at all, Your Honor. It simply chose to sit on the sidelines and then to come to court after the license was issued. So, fundamentally, the rules are simple, and there are really four of them governing jurisdiction. First— Well, let me ask you a question, though. Texas is only presenting, I believe, legal arguments. And since when is a commission given the ability to decide its own legal status? Can't we review that? Well, let me point to what exactly happened in an exactly parallel situation when Utah made substantially the same challenge to the licensing of the PFS facility. And the commission weighed Utah's legal arguments there, and the ultimate decision that the commission reached was the subject of both the Tenth Circuit's opinion as well as the D.C. Circuit's opinion. So the commission certainly has the authority to articulate its view of its jurisdiction. Of course, right now the commission is challenging all the interveners in the D.C. Circuit, right? Well, I think the reverse is true. The interveners are challenging— The denial of intervention. The denial of the—the denial of the admission of the contentions. But we don't—we don't contest that those petitions for review were appropriately brought because that's the sequence that Congress designed, where someone tries to raise a contention before the agency, the agency adjudicates those contentions both with respect to the law and with respect to the facts, and then the commission's determinations are subject to judicial review, as we're seeing not only with what Faskin is raising, but that the other parties to the NRC proceedings have raised. I want to make clear also that although Texas has invoked the so-called ultra-veris exception that this Court has recognized in limited circumstances, what those cases make clear, and in particular the Merchants Fast Motor Lines case makes clear, is that where you do have the opportunity to raise an argument before the agency, and in particular a statutory argument, then the ultra-veris exception is not available. So again, as happened in Utah, and in fact as happened in these proceedings, it is possible and it is Congress's desire that parties raise legal as well as factual arguments before the agency, and that the agency have an opportunity to adjudicate them so that a full record can be established, that the agency's views can be heard, and so we're not stuck in a situation where there isn't an agency record before the Court. Texas asserts, well, that it would have been futile to somehow come to the Commission, and let me quickly dispense with that. First of all, we're talking about a statutory exhaustion requirement, and there's no futility exception. The other thing I just want to raise is that if Texas is correct that it would have been futile, what that also means, as Your Honor asked, is that its arguments are barred, or at least are flatly inconsistent with the D.C. circuits and Tenth Circuit's decisions in both the Bull Creek and Skull Valley cases. Texas asserted in its briefs that it's bringing something new to the table, but if its argument is that it's futile to go to the Commission, what that means is that it doesn't have anything new to offer at all. Let me turn to the merits. The first words that we heard from Texas today was that things having to do with nuclear waste are major questions. Well, that's not the issue that Texas presented to the Court and that Texas contends is the major question. The issue that Texas presented to the Court is whether the agency's authority, which already includes the storage of nuclear waste on-site, also extends beyond that and includes the authority to issue license for the storage of nuclear waste off-site. Well, let me ask you a question. The government explains that the NWPA doesn't even apply here. Is that right? That's absolutely correct. So when does the NWPA apply? The NWPA applies when... Only when the government decides it's going to go with the NWPA. There are a number of different options that the government has, or at least had, I should say, because it's in the past tense, but one of the available options to the government was the so-called federal interim storage program. Correct, at federal land sites. I read all the relevant it says, storage of spent nuclear fuel is very important. Well, we can all agree on that. Whether that pushes us toward a major question, I don't know. But at the same time, every bit of that is saying we need to do something until Yucca Mountain gets opened. Yucca Mountain is the choice of Congress. Yucca Mountain must be opened if you try to move spent nuclear fuel. We are going to license the current reactors to hold that spent nuclear fuel, or we're going to license on the federal property, so long as nuclear fuel, Yucca Mountain is being proceeded with. And oh, by the way, as Mr. Bash points out, if we try to allow any other licensing, then not only can the states attempt to override it, but Congress can override the states. In other words, it overwhelmingly seems to me that Congress chose to have its hand on the neck of the NRC, or whoever the regulatory licensing people were, to tell them what to do. I don't see how you can claim that you have this overarching de novo authority. Respectfully, Your Honor, let me explain to me why I don't think that's correct. Congress was fully aware of the NRC's Part 72 authority. Part 72, I'm talking about the portion... Which had barely been exercised at that point. It was somewhat new, but that only underscores the fact that Congress was aware of it. And Congress decided to supersede it. Respectfully, Your Honor, I disagree. The provisions of the Nuclear Waste Policy Act that you're referring to specifically state, notwithstanding any other provision of law, i.e. recognizing what the AEA has to say, and then it says nothing in this act, i.e. the Nuclear Waste Policy Act, shall be read to encourage off-site storage. It's not talking about what other acts provide for. And one of the things we didn't hear from Texas at all today was... So the only way, the only circumstance in which states and Indian tribes have a right to totally participate in this situation, to totally have transparency at every step of what the agency does, to voice their concerns in such a way they cannot be overridden, is under the narrow circumstance of the NWPA. That's your position. Because otherwise, your whole argument is, we can write off Texas, we can write off Indian tribes, if there were Indian tribes relevant, and just do our thing. And if, by gosh, they don't comply with every tittle and jot of the Code of Federal Regulations, they have no right. I disagree, Your Honor. And I think that that goes back to the very exhaustion point I was making. And you've made your point very well. But I'm saying that all of that is totally inconsistent with the careful and congressionally mandated framework of the NWPA, which talks about spent nuclear fuel, which the Atomic Energy Act does not. Well, the Atomic Energy Act... Well, a couple points, Your Honor. First, the Nuclear Waste Policy Act talks about the storage and or disposal by the federal government of spent nuclear fuel. It does not refer to, and none of the provisions that Mr. Bash referenced have anything to do with a private off-site storage facility or any kind of license issued to a private facility to store spent fuel. The question is, how does that cut? I'm sorry? How does that cut? Does that cut in favor of its broad authority or very minimal authority? I would think it would be more minimal, wouldn't it? I think, Your Honor, you would think it would... You're saying that the NWPA is about federal control, not about private. That's correct. Then you have to look for somewhere else. Right. But that's in the AEA. And what I wanted to say earlier was that we didn't hear a single word here today about the NRC's authority provided since 1954 under the Atomic Energy Act to issue licenses for the possession of source material, of byproduct material, and of special nuclear material. Let's talk about that. Because as I understand those provisions, 2073, 93, and 2111... Correct. ...those do give you the power to issue licenses about those materials, but only for specified purposes. There are conditions, yes, Your Honor. Right. But it's not for storage of the most radioactive materials. Well, it can be, provided that the agency has made a finding that it's appropriate. And that's what happened when the agency issued Part 72. But when you... I mean, normally when you see a statute providing a commission of power to do X, Y, and Z, we don't assume that it provides power for A, B, and C, right, expressio unius, right? The fact that they've provided this suggests that that's the limit of the power. Well, there are, yes, but there are also conditions under which the agency has broader authority than merely X, Y, and Z. And that's Z prime or whatever we want to call it. And that's when the agency has determined that it would be an appropriate exercise of its authority under the Atomic Energy Act. What's the text you would point to? Because that's what I find haunting about Bull Creek is there's very little textual... In Bull Creek. Well, as Texas suggests that, well, the AEA's authority wasn't even specifically challenged. But let me go back to Part 72, back when the agency even articulated this authority. And, of course, there wasn't any challenge then. And perhaps had there been, this might have been set forth with greater detail. But the agency made clear back in 1980 that it saw that there was a need for private away from reactor storage. And what it did was to then issue authorizations to licensee, to the owner to spend fuel to ship fuel to other storage. I get the need perceived by the NRC. I like the policy argument. What's the text that you're citing? Because my concern is that the text specifically limits, provides for certain purposes and not for private storage. Right, but the agency recognized through longstanding court decisions and longstanding history of its regulation of the nuclear industry, about which it's certainly Congress's designated expert, that there is a need for additional storage. Because in the absence of that storage, nuclear power plants will shut down. Your point is it's a Chevron deference type fact pattern, right? The statutes don't specify specifically what to do about private storage. And therefore, we should defer. Well, it's more than that, though, Your Honor. Because the statute does not speak of any restriction on away from reactor versus at reactor storage. In fact, there is zero restriction whatsoever on the agency's ability to issue licenses for the storage of spent fuel. There's no geographic term. No restriction or authorization. Not explicit authorization. Well, there is authorization to do so. It doesn't say, well, you can do it at reactors, but you can't do it anywhere else. Let me ask you, though, in the AEA, they define these terms, I believe. It's either the AEA or the NWPA. Spent nuclear fuel is a specifically defined term in the NWPA, differentiated from these other kinds of reactor or nuclear waste or whatever that you're talking about. And if that's the case, how can you fold spent nuclear fuel sort of, you know, by happenstance into the other definitions? Well, Your Honor, I don't think it's by happenstance that. Well, it's the specific versus the general. And the specific provisions control over more general definitions. Well, Congress specifically, let me make this clear. Congress specifically provided to the agency the authority to issue licenses for source material, for byproduct material, and for special nuclear material. Those are clear grants of authority. And that's what the agency did here. The agency issues licenses for scores of different types of industrial equipment. It never licensed spent nuclear fuel except for two instances, one of which is not operative here. And I forget, you know, they're both very unique circumstances. So this would be the first major spent nuclear fuel facility under what NRC claims is its inherent power. Well, I think the relevant question, and I think this is what Judge Wilson got to before, is whether the agency has licensed this. The fact of the matter is that, yes, the agency has been licensing this, and it's had the authorization to do so for 40 years. It has been doing it for that long. But is it wrong, on Judge Jones's point, that Congress would have addressed the scheme that it did in the NWPA and just forgotten private storage, or not addressed it at all, and just left, again, the general as opposed to the specific? Respectfully, Your Honor, it's not possible. And I'll tell you exactly why that's the case. Because Congress was fully aware of the agency's Part 72 authority. In fact, this was the subject. This is set forth in particular in the agency's decision denying the petition for rulemaking in the Bull Creek decision. But it specifically discussed the fact that there was private storage, and it declined to make the exhaustion of the private storage requirement a precondition to the use of federal interim storage. But that discussion reveals just how into the thick of it— But then why would Congress have said you can't even do a federal storage facility until Yucca Mountain is proceeding? And it was the two administrations ago that they decided to ignore Yucca Mountain. Well, Your Honor, there are dozens of reasons why the restrictions imposed upon what is exclusively a federal facility need not apply to a privately operated facility. As an example— I would think there would be fewer, because the federal government has control over a federal facility that it only achieves over a private one by licensing. Well, certainly there are policy reasons one way or another, but those are certainly for Congress to decide. But the point is that there are more than a number of rational reasons why Congress would choose to have specific instructions vis-a-vis a federal facility, not the least of which is that Congress is paying for this, whereas it's not paying for the cost of a private facility. So it doesn't need to minimize— Congress doesn't care about the cost as much as it— I mean, of anything nowadays. But I mean, in regard to spent nuclear fuel, Congress's main interest is in health, safety, and accommodating the interests of the state, according to the NWPA. Well, again, Your Honor, Congress has reasons why it could— The question here isn't what's the best answer. The question is, might Congress have rationally decided that it makes sense to have a different set of restrictions on a privately owned facility as it does on a publicly owned one? And it chose to do so. Okay. Well, you— I want to go back to the— One more. This will be the last one. I just want to try to understand the text of the AEA and your textual argument correctly. As I understand, looking at these three provisions, because I think that's what we're talking about in terms of the AEA, right? 2073, 2093, and 2011—2111. The only reference I see to NRC power with respect to disposal is in the byproduct material section, where they talk about the disposal of radium-226. Is that right? There's no other reference to disposal and storage. That's correct. I recognize Judge Jones' concern about time. If I may quickly just speak to that. This goes back to the very first thing I said today, Your Honor. Disposal is not the same thing as storage. And when we hear Texas's arguments and we read its briefs, I beseech the court to ask itself, are we talking about storage here or are we talking about disposal? Because storage is a different thing. Storage falls within the AEA's definition of possession. And when we possess spent nuclear fuel, that's what's being done. That's fair enough. I guess my question is, how does that cut? Because if there's no reference to storage and only limited reference to disposal, then that suggests to me that it's only about—that the NRC's power is only about research and development and science and industry and all this stuff and not about storage. That's my textual question. I disagree, Your Honor, because we're talking about here the power to possess. And if we can go back to Part 72, when the agency issued its license— when the agency promulgated Part 72 back in 1980, 42 years ago, it explained that what it was doing there was issuing a materials license. Again, not a facilities license, but a materials license solely for the possession of spent nuclear fuel. And that's— So your theory is Congress was essentially silent and therefore deferred to the regulatory structure? Silent but not unaware. Fully aware and chose not to—deliberately chose not to do anything. Okay. Thank you, Your Honors. All right. Thank you. Mr. Fagg. Thank you, ma'am. Please support Brad Fagg for interim storage partners. I'd like to pick up with the discussion of text that we've been talking about this morning. And there's an additional provision. It's 42 U.S.C. 2201, which is section 161B of the Atomic Energy Act, which also refers to possession. Okay. You cannot possess this stuff by holding it in your hands. Okay. To possess it, you have to have something to do this with. Texas, in their opening brief at page 17, note 6, acknowledges the authority of the NRC to license possession, but they say at reactors. The words at reactor do not appear in any of these statutes. Okay. The at reactor does not appear in the Atomic Energy Act. It is the state of Texas' arguments that's doing violation to the statutes here, because they are inserting qualifications that don't exist. The notice and comment rulemaking that was undertaken in 1979 and 1980 resulted in the crystal clear regulations that are on the books now. And it's not, and I think this is important, and it goes back to something Judge Wilson said earlier, it's not just one or two facilities out there now. When a power plant shuts down, and a number of them have, the facilities license, which is the license to operate the power plant, in many cases, goes away. And so what is left there now, at least a half dozen other sites across the country, is essentially- And you're proposing to put all that stuff in the Permian Basin, correct? It's got to go somewhere, sadly, Your Honor, because the government hasn't- Well, if it's safe where it is, why does it have to go somewhere? It will be safe- Before Yucca Mountain. It will be safe wherever it is because- Well, what about Yucca Mountain? There's no, I think we can all stipulate we wish Yucca Mountain was built. No, we don't wish, that's not what I, that's what Congress stipulated. Oh, and believe me, and there are dozens and dozens of cases, and I've been involved in a number of them out there, because of DOE's failures to do that. But we are where we are. And we have to do something with this waste. And there is nothing in any statute that imposes an at-reactor requirement. It certainly is not in the Atomic Energy Act. And the Nuclear Waste Policy Act does not apply, with all due respect to this case, at all. Because this is private storage, and it is storage, not permanent disposal. So why did Congress bother with the NWPA? Well, because it, as again, I said, we could stipulate we wish it would have worked. We wish Yucca would have been in 1998. But it didn't, and now the waste has to sit somewhere. Why does... Now, wait a minute. Now, wait a minute. So you're saying that the real authority comes out of the AEA and a regulation in 1980. Congress passes this extremely comprehensive statute. And you're saying that didn't work, and therefore we ignore it. No, I'm not saying it didn't work. That's what you said, it didn't work. It doesn't apply here, Your Honor. Congress passed a statute that tells DOE to do something, and it talked about permanent disposal. This is neither one of those. So, like, I don't want to repeat myself too much. We are where we are. The waste is going to sit in Illinois, or Connecticut, or Oregon, or somewhere. And it's not going to be disposed of permanently. That's all the protections the Nuclear... Let me ask you a question, sir. Why can't ISP license itself to regulate those former nuclear plant sites? I'm sorry, I didn't understand the question. Why can't ISP get licensed for storage at those former sites? Well, those former sites have the same kind of license Texas is trying to invalidate here. They have Part 72 possession licenses. So, if ISP wants some business, what's the problem with having it dispersed rather than all in one place? Well, it's to give the option. We're getting into, you know, the purpose and need and policy judgments that go far beyond statutory authority, which is what's at issue in this case. And it can't be seriously questioned that the NRC has statutory authority to issue licenses to possess the constituent elements, which are the one and the same of spent nuclear fuel. And the Nuclear Waste Policy Act did not abrogate that. Who possesses it? You mean they can license anybody? You know, as I understood the AEA, they license... The government had control over the nuclear energy components or whatever, the uranium or whatever. And it would dispense it out to these places, right, to create electrical plants, nuclear energy plants, right? Or there's a market in uranium and they have to list it. Anyway, once they license the plant, it possesses the nuclear fuel. It possesses the spent fuel, right? Private parties, yes, are licensed by the NRC to possess spent nuclear fuel. Power plants are also, when they're operating, licensed by the NRC to do all the things you have to do to operate a nuclear power plant. That's not what we're talking about here. That's a facilities license. That's where Texas is trying to go. But Texas, A, reads conditions into the possession authority under the AEA, and B, would read the possession scheme, which has existed for almost half a century, as meaningless. And what about those half dozen sites I referred to? There's in Oregon and in Michigan and in the New England area. What about those sites where there's no longer any reactor? But there's these cans that we talked about on these parking lots there, and if this court invalidates the licensing basis of, you know, what keeps those things safe, which is a possession license just like ISP has sought and got approved by the NRC here, what happens to those half dozen sites across the country? Can they do anything they want with the fuel? I think we have to go back to the text. I see my time is up, but I want to go back with where I started. The text here supports the license here, and it is Texas, not the NRC or ISP that's doing violence to that text. All right. Thank you. Mr. Bach? A few points, Your Honors. I'll try to be brief with all of them. First, I agree with my friend from the intervener that you cannot possess something without somewhere to put it. The Atomic Energy Act said where they can put it. It's a production facility or utilization facility. The Atomic Energy Act says nothing about waste facilities. I'm sorry. What statute are you referring to? The Atomic Energy Act. Which I want to make sure I get the text. 42 U.S.C. 2132 refers to production facilities and utilization facilities. And all of the provisions that talk about possession of byproduct material, special nuclear material, source material, they also say, well, this can be licensed to go in a production or utilization facility. That's explained in more detail in our reply brief, I think. There's been a lot of dispute about how to read the Atomic Energy Act and the Nuclear Waste Policy Act together. I think I have the answer for Your Honors. This is from the Brown and Williamson case, often treated as the seminal major questions case. We cite it in our supplemental brief, although I apologize. It probably deserved more treatment than that. Brown and Williamson at page 143 says the following. At the time a statute is enacted, it may have a range of plausible meanings. Over time, however, subsequent acts can shape or focus those meanings. To the extent that you think the Atomic Energy Act had a range of plausible meanings when it was enacted, the Nuclear Waste Policy Act makes crystal clear what it means now. And it does not allow the Nuclear Regulatory Commission to license private away from reactor. But what do you do with the regulations that were in force at the time the NWPA was enacted? Well, I think, Your Honors, 42 U.S.C. 10153 tells you exactly what to do with those regulations. That provision of the Nuclear Waste Policy Act explicitly preserved the NRC's regulations for at reactor storage. That's in the statutory text. So Congress was plainly aware of the NRC's regulations, and it did not preserve those regulations as they may apply to away from reactor. But it did it in silence, right? In other words, Congress knew about these regulations and just didn't address them? Well, if... That seems to be their argument that, well, this was all viable because Congress was just addressing something different in the NWPA. If Congress were meant to silently approve of the NRC's regulations, then 42 U.S.C. 10153 is a complete nullity. It had no reason to explicitly preserve any regulations if, as my opponents have suggested, Congress implicitly preserved all of the regulations. Judge Jones, you asked about... I'm sorry. Just real quickly, what do you do with the argument that they made about these decommissioned facilities that are effectively now temporary storage facilities? So there may be a complex remedy question there, Your Honors. There may be some illegality occurring, either committed by the NRC or the Department of Energy. We haven't briefed that. That's not our issue. We're not going to challenge what's going on at these nuclear reactors. There's a complex remedy question at issue there, and I'm not sure that I know what the answer is, but I don't think it affects this case. But if we invalidate this license, do we invalidate those also? Well, at a bare minimum, there'd be a statute of limitations problem with those facilities, right? I don't see how anybody could challenge what's happening at those facilities. If I understand correctly, I think what's happening at those facilities is that they were licensed for a specific period of time to produce nuclear energy. Now those licenses maybe are expired in some respects, but the licenses that were in effect always allowed those reactors to have waste at the site. To the extent that those licenses have expired now, I'm candidly not sure how the Nuclear Regulatory Commission is supposed to deal with that problem. But the waste is going to be there one way or another until the federal government solves this problem. I go back, you cited 42 U.S.C. 2132, or did I mishear you? 42 U.S.C. 2132, that's right. How does 2132 support your position? Unless I'm mistaken, I think 2132 refers to production and utilization facilities, Your Honor. Right. And so the Atomic Energy Act recognizes that the NRC has power to license specific kinds of facilities, but it only gives them power to license production facilities. Well, I mean, nobody contemplated at the time of the EA that there would be a need to store spent nuclear fuel, right? I mean. I think that's largely correct, Your Honor. I mean, I think the Congress- Well, the briefs start off by saying that, that sometime during the 50s, 60s, and early 70s, it was, quote, realized that there was a need that you couldn't reprocess the fuel indefinitely. That's right, Your Honor. But I think everyone always recognized that the spent nuclear fuel would have to be stored for a brief period until it could be reprocessed. And it was always going to be stored at reactors. Well, yeah, but that wasn't going to be 40 or 50 years. Right. That's right, Your Honor. That's why the Congress enacted the Nuclear Waste Policy Act. I recognize that I'm out of time. I'd be happy to answer your other questions. Otherwise, I'll turn it over to Micah. All right. Thank you. All righty. Mr. Kanner. Thank you, Your Honor. The Nuclear Waste Policy Act specifically says at 10-151, part one, the persons owning and operating civilian nuclear power reactors have the primary responsibility for providing interim storage of spent nuclear fuel from such reactors by maximizing, to the extent practical, the effective use of existing storage facilities at the site of each reactor. It goes on to say the federal government, including the NRC, has the responsibility to encourage and expedite on-site storage. We talked about the ISFSI that were licensed. I think ISP mentioned those. There have been 10. It's on the website for the NRC. Six of those involve creating an installation at the facility, right? The decommissioned facility. Then it got a license for an ISFI. In one case, it was adjacent to it. That would be the Trojan reactor in Oregon we heard about, the one in Michigan. You don't need to... What's your site for that? For? Your citation. You said you read about. Oh, it was the NRC's website. They list 10 ISFSI facilities. You can furnish that in a post-argument note to us, 28J letter. I will do that, Your Honor. Thank you for the opportunity. So there is... The purpose and need talks about decommissioning plants and the need to move this stuff. There's nothing in the record that shows, in fact, that storage at the location of the former reactor doesn't work. There's no evidence, because what the NRC said was, we don't have to look at the substance of the purpose or need, as well as not looking at transportation issues as well. There's no evidence of the lack of on-site storage. And it's certainly... The presumption in the NWPA is that you continue to store it at the site or former site of the reactor. And there's similar language that I mentioned earlier with respect to the transportation. You're supposed to minimize it. In other words, the NWPA said, look, there are all these reactors out there. Fine. Thank you. We can read the statute. And you're going way over here. Thank you. Unless someone has a question. Okay. Thank you. Thank you, gentlemen.